### SHARPE et al. v. CHARTIERS OIL CO. et al.

### SCHUYLER et al. v. SAME.

(Circuit Court of Appeals, Sixth Circuit. June 6, 1916.)

### Nos. 2787, 2788.

CORPORATIONS ⊜573(3)—REORGANIZATION AGREEMENT—POWERS OF COMMITTEE.

A plan and agreement for the reorganization of an insolvent corporation, prepared by a reorganization committee and approved by the stockholders and bondholders, clothed the reorganization committee and voting trustees, who were to hold and vote the new stock, with full powers to act for the corporation, and to "acquire, manage, control, operate, or dispose of" the whole or any part of its property. The voting trustees were empowered to "exercise all rights and powers as absolute owners of the stock." The agreement further provided that, after acquiring the property of the old company, the corporation should execute a mortgage securing its bonds issued in large part to the old bond and stock holders, which should cover all the property of the new company "owned at the execution of the mortgage or thereafter acquired." Prior to the execution of such mortgage, through the reorganization committee, whose acts were approved and ratified by the voting trustees, executed an oil and gas lease on lands of the company, and the mortgage was made subject to such lease. *Held*, that the execution of such lease was within the powers of the committee and voting trustees, and in the absence of fraud or bad faith was valid and binding on the corporation, and could not be attacked by minority stockholders or bondholders, and that as a matter of fact it was executed in good faith and in the interest of efficient management of the affairs of the corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 2296; Dec. Dig. ⊜573(3).]

Appeal from the District Court of the United States for the Eastern Division of the Southern District of Ohio; John E. Sater, Judge.

Suit in equity by the Chartiers Oil Company against the Hocking Valley Products Company and others. Decree for complainant, and defendants Frank M. Sharpe, Ludwig Koempel and others, and defend-

---

ants Sidney S. Schuyler, John R. Chadwick, and Charles L. Burnham, copartners, James W. Murphy, William F. Osborne and others, separately appeal. Affirmed.

Wm. L. Day, of Cleveland, Ohio, W. B. Crisp, of New York City, and John H. Price, of Cleveland, Ohio, for appellants.

Lawrence Maxwell, of Cincinnati, Ohio, Carl Ehlermann, Jr., of New York City, W. O. Henderson, of Columbus, Ohio, and A. Leo Weil, of Pittsburgh, Pa., for appellees.

Before KNAPPEN and DENISON, Circuit Judges, and SESSIONS, District Judge.

SESSIONS, District Judge. The Columbus & Hocking Coal & Iron Company was an Ohio corporation with an issued capital stock somewhat in excess of $7,200,000 and owning about 13,000 acres of iron, coal, oil and gas lands located in the state of Ohio, which were subject to a first and supplemental mortgage amounting to $2,-000,000, and also owning substantially all of the capital stock of a subsidiary corporation known as the Columbus & Hocking Clay & Brick Company, which in turn owned about 3,000 acres of clay land and a brick plant subject to a mortgage of $1,000,000. In January, 1910, the Coal & Iron and the Clay & Brick Companies were in financial distress and unable to meet their maturing obligations, and upon application of creditors, receivers were appointed for each of them by the Circuit Court of the United States for the Southern District of Ohio.

Soon after the receivers were appointed the security holders and stockholders began planning to reorganize the companies upon a better financial basis. The three defendants Alexander Gilbert, Frank B. Keech and Frank N. B. Close were appointed a reorganization committee. In May, 1910, a so-called deposit agreement was made, in and by which the defendant Bankers' Trust Company was designated as depositary, the bondholders and stockholders were requested to deposit with the depositary their bonds and stock, and the reorganization committee agreed to formulate and submit plans for the reorganization of the companies. Between July 1, 1910, and October 1, 1910, the reorganization committee prepared and submitted complete plans and agreements for the reorganization of the Coal & Iron Company. In their final form the plans and agreements so prepared and submitted prescribed and defined the authority and powers of the reorganization committee and, in substance, provided for the organization of a new corporation with capital stock of $4,600,000 and a first mortgage bond issue of $2,000,000 to take over the properties of the Coal & Iron and Clay & Brick Companies; a corresponding scaling down of the stock and securities of the old companies and, through the depositary, the exchange thereof for the mortgage bonds and stock of the new company; an assessment of $10 per share upon the stock of the Coal & Iron Company and in consideration of the payment thereof the delivery of an equal amount of the bonds of the new company; the creation of a sinking fund for the retirement of the new bonds; and the appointment of three voting trustees to receive and to control as owners all of the stock of

the new company. These plans and agreements were assented to and approved by the bondholders and stockholders, including appellants, of the old companies, and thus were effective.

Pursuant to the reorganization plans and agreements, the committee organized the defendant, Hocking Valley Products Company, selected its board of directors and other officers and procured them to qualify as such, and also, between July 27, 1911, and August 15, 1911, purchased at foreclosure sale the properties of the old companies, paying for the same with the securities and cash proceeds of the assessment which had been deposited with the Bankers' Trust Company for that purpose, and caused such properties to be transferred and conveyed to the new corporation. Subsequently the defendants Nicholas Biddle, Justin Du Pratt White, and Frank N. B. Close were appointed voting trustees. Mr. Biddle and Mr. White were selected by the security holders.

The oil lease here in controversy was made and executed on the 22d day of August, 1911, and immediately thereafter was properly recorded. The lease is in the usual form and by its terms the Hocking Valley Products Company granted and leased to the plaintiff, Chartiers Oil Company, "for the term of ten years * * * and as much longer as oil and gas are found in paying quantities," all of the oil and gas rights in and under its lands together with the exclusive right of drilling and operation. The Chartiers Oil Company paid a bonus of $185,000 for the lease and agreed to deliver free of expense into tanks or pipe lines for the Products Company one-eighth of all the oil produced and saved on the premises and further agreed to drill at least ten additional wells. After their appointment the voting trustees ratified and approved the lease.

On September 23, 1911, the Hocking Valley Products Company executed and delivered to the Bankers' Trust Company, trustee, a mortgage upon all of the properties which it then owned, including in effect its interest in the oil lease, to secure the payment of its first mortgage gold bonds to the amount of $2,000,000. The amount of bonds actually issued and delivered was $1,836,300. By its terms this mortgage was subject to the oil lease to the Chartiers Oil Company and also subject to several other leases authorized by the court and made by the receivers while they were in possession of the property.

The original bill of complaint in this case was filed by the Chartiers Oil Company to quiet its title to the oil lease and to remove a cloud thereon created by two suits in New York and one in Ohio brought by some of the appellants herein to cancel the lease or to have it decreed to be subordinate to the mortgage. The Hocking Valley Products Company, the members of the reorganization committee, the Bankers' Trust Company as trustee, the voting trustees and the present appellants were made defendants. All of the defendants answered, but none of them opposed the granting of relief to plaintiff except appellants, who, as bondholders or stockholders, answered and asked for the same affirmative relief as they had sought to obtain in the suits in the state courts of New York and

232 F.—45

Ohio. This appeal is from the decree of the lower court quieting plaintiff's title to the oil lease and denying relief to appellants.

Appellants' chief contention is that the making, execution and delivery of the oil lease were unauthorized and constituted a breach of trust and the misapplication and diversion of trust property in fraud of the rights of the bondholders and stockholders of the Hocking Valley Products Company. The question thus presented is largely, if not wholly, one of fact. The modified plan of reorganization provides that the new "mortgage shall cover all the property of the new company owned at the execution of the mortgage or thereafter acquired." Appellees insist that thereby permission is given, impliedly if not expressly, to lease or otherwise dispose of part of the new company's property before the execution of the mortgage. However that may be, the reorganization plans and agreements, which were entered into with deliberation and presumably contain the entire contract of the parties thereto, will be searched in vain for any prohibition, either express or implied, of the making of a lease with priority over the mortgage. On the contrary, with many verbal repetitions and variations too lengthy to be here recited or even summarized, these agreements clothe the reorganization committee and the voting trustees with broad, comprehensive and absolute powers to acquire, manage, control, operate or dispose of the whole or any part of the property in their hands in accordance with their own judgment and discretion and to the same extent that the bondholders and stockholders might personally do. Finally, with the apparent purpose of removing every possible limitation upon the power and authority of the reorganization committee and the voting trustees, the agreements provide:

"The committee may construe the plan or any modification thereof or substitution therefor, and this agreement, and their construction thereof or action thereunder in good faith shall be final and conclusive. They may supply any defect or omission or reconcile any inconsistency in such manner and to such extent as shall be necessary to carry out the same properly and effectively, and they shall be the sole judge of such necessity."

And:

"During the term of this agreement the voting trustees shall possess and be entitled to exercise all rights and powers as absolute owners of the stock deposited hereunder including the unrestricted right to vote for every purpose and to consent to any and all corporate acts."

The conclusion is irresistible that the oil lease was authorized and is valid unless it is tainted with fraud or bad faith.

Appellants' pleadings are replete with charges of fraud and bad faith, but satisfactory proof thereof is wanting. No claim is made that trust property has been used for private benefit or gain, or that any individual has been guilty of misconduct involving moral turpitude. The gravamen of the charge made is that the leasing instead of operating the oil property was a breach of duty and of contract. In this connection it must be remembered that at the time the lease was made the lands belonging to the corporation were not "proven" oil territory. A former lessee, after drilling several wells

at large expense and finding only two which produced oil in paying but constantly diminishing quantities, had abandoned the venture. It must also be borne in mind that appellants' suits and cross suits to set aside the lease were brought after the present lessee had drilled upwards of 60 wells and done other development work at an expense, including the bonus paid, of more than $1,000,000, and had demonstrated that the oil properties could be successfully and profitably operated. If a loss instead of a profit had resulted, it is quite certain that no complaint would have been heard. Having risked nothing these minority stockholders and bondholders seek to reap all the benefits of another's sowing. As said by the District Judge who heard this case:

"The evidence, as a whole, spread upon the record is altogether insufficient to establish fraud, or a pledge or an obligation that the proposed corporation would itself conduct an oil business."

It is difficult to perceive how appellants or other bondholders and stockholders have been injured by the lease. The old company had failed. The new company, even with the funds derived from the cash assessment, did not have adequate or sufficient capital to prosecute the necessary oil development work. Without the bonus paid by the Chartiers Oil Company, the payment of the early installments of interest on the new bonds would have been doubtful if not impossible. Thus far the interest has been paid promptly. The bondholders are not concerned in the methods of the operation of the property otherwise than as such operation may affect the security and ultimate payment of their bonds. The final plans of reorganization provided for the creation of a sinking fund of fifteen cents per barrel of oil produced to pay and retire the bonds. In the mortgage:

"The company covenants and agrees that until the bonds hereby secured shall have been fully paid, or the moneys to redeem the same as herein provided shall have been deposited with the trustee, it shall and will pay to the trustee within six months after the close of each fiscal year of the company as and for a sinking fund for the further security of the bonds issued and outstanding hereunder and for the redemption and retirement thereof as herein provided * * * a tax or royalty of fifteen cents (15c) per barrel or fifty-two (52) gallons of oil pumped or taken by the company directly from the property, * * * and also on the oil which was, during such fiscal year, pumped or taken by a lessee or licensee of the company from property subject at the time of taking to the lien of this indenture."

This covenant has been kept and from the sinking fund so created upwards of $300,000 of the bonds have been paid and retired, thereby increasing the security of those still outstanding.

The stockholders are not concerned with priorities as between the lease and mortgage. Both are superior to the stock. The mortgage trustee and the holders of more than 80 per cent. of the stock and bonds of the company have at all times been satisfied with the lease. The mortgage expressly authorizes the company to lease its property on the terms upon which it has been leased, requiring only that the specified royalties shall be paid into the sinking fund as they have been paid. Hence, if the lease had been made after the mortgage was executed and recorded the priorities might have been fixed as

they are in the existing instruments. At any rate, even if prematurely made, the lease has been fully ratified and is not now open to attack upon that ground.

The conclusion reached makes it unnecessary to consider or decide other questions argued and submitted relative to the Chartiers Oil Company's knowledge, actual or constructive, of the provisions of the reorganization plans and agreements and of the existence of a trust thereby created; the effect of the recording statutes of Ohio; the estoppel of appellants by the terms of their agreements and by the acceptance and rentention of their stock and bonds and the interest upon the latter as well as other profits and advantages; and their right to bring suits for the Products Company or the mortgage trustee or for their own indirect benefit.

The decree of the lower court is affirmed.